IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Thomas Mervyn, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | )<br>) Case No.: 1:11-CV-06594 |
| v. | )<br>) Judge Gary Feinerman |
| Nelson Westerberg, Inc.; Newesco, Inc.; Nelson Westerberg International; Atlas Van Lines, Inc.; John R. Westerberg; Edward J. Pionke; Stephen R. Westerberg, | )<br>) Magistrate Judge Young B. Kim<br>)<br>)<br>) |
| Defendants. | ) |

### DEFENDANTS' LOCAL RULE 56.1 STATEMENT
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants NEWESCO, INC. ("Newesco") and ATLAS VAN LINES, INC. ("Atlas") by their counsel and state that there is no genuine material issue as to the following facts:

1. Thomas Mervyn ("Mervyn") entered into a Contractor Agreement and Lease (the "Lease") with Newesco on February 12, 2010. The Lease terminated on January 5, 2011. (Mervyn's Complaint, Docket No. 1, referenced as Exhibit A herein. The Lease is Exhibit A to Mervyn's Complaint; Affidavit of David Green, Exhibit B, ¶ 2).

2. Contrary to the allegations of ¶¶ 25 – 31 of the Complaint, and even though not required to do so, Newesco complied with its practice by providing Mervyn with copies of the Rate Audit Review ("RIRA") and Rating Invoice and Distribution ("RTDS") screens at or near the time of settlement, in addition to the Settlement Sheets, and, in accordance with Section 12 of the Lease, agreeing to make documents available for Mervyn's review at his request. (Exhibit B, Green Affidavit, ¶¶ 5 – 10).

3. Section 10 of the Lease provides for the existence of a Cash Reserve Account (which is an escrow account), and its return after termination of the Lease. Newesco returned the balance of Mervyn's Cash Reserve Account on February 17, 2011, less than 45 days after the Lease terminated. The reconciliation discloses that Mervyn currently owes Newesco $546.09. (Exhibit B, Green Affidavit, ¶¶ 11-14).

4. Section 11(f) of the Lease provides:

> Financial entries made by Agent on payment documents shall be conclusively presumed correct and final if not disputed by Contractor within 180 days after distribution. On the date 180 days after distribution, such documents shall constitute the primary business record between Agent and Contractor with respect to financial transactions existing between the parties as reflected on the statements, and additional underlying documentation, in support of the documents, shall not be required as a matter of proof before any administrative or judicial tribunal.

(Exhibit B, Green Affidavit, ¶ 23).

5. Mervyn never disputed any financial entries regarding shipment distribution or expenses on any payment documents within 180 days of distribution. (Exhibit B, Green Affidavit, ¶ 24).

6. Contrary to the allegations of ¶¶ 24 and 32 of the Complaint (Exhibit A), the Lease did not provide for compensation to Mervyn "based on a fixed percentage of the gross revenue by the shipper." Instead, it was calculated using the "effective bottom line discount" or "EBLD." Schedule B of the Lease provides (emphasis added):

> (a) Line haul and accessorial service charges shall be determined by applying the applicable *effective or predetermined bottom line discount* (determined under Carrier's rules) to the transportation and accessorial charges for each shipment.

(Exhibit A; Affidavit of Mary Beth Johnson, referenced as Exhibit C herein, ¶¶ 9-14).

7. The EBLD is the effective bottom line discount that applies on a shipment after all forms of discount or rebate are considered, including taking into effect all free charges for

services performed by Atlas or third parties, but for which the customer was not charged. The EBLD varies from shipment to shipment, and from customer to customer, depending on the terms of the contract between Atlas and the customer. Different customers have different discounts, rebates, and/or free services. The EBLD is different from the billed discount shown on the customer's invoice. Line haul revenue determined using the EBLD is different from gross revenue. (Exhibit C, Johnson Affidavit, ¶¶ 9-14).

8. Mervyn received information showing the EBLD and the calculations of his compensation using the EBLD for each shipment. His Settlement Sheets showed the EBLD percentage in the lower right hand corner, and the RAR and RID screens showed the net billed and net distributable amounts and percentages. (Ex. B, Green Affidavit, ¶¶ 5-7; Ex. C, Johnson Affidavit, ¶¶ 13-19).

9. Before his contract with Newesco in February 2010, Mervyn had earlier entered into a contract with Ace Relocation Services Joint Venture in 2007. That contract also provided that his compensation would be calculated using the EBLD, and he received documents showing him that the compensation so calculated was different than a percentage of the billed amount. (Ex. D, excerpts from Docket No. 132).

10. Over the term of his contract with Newesco, Mervyn was paid $3,019.74 more for line haul services than he would have been paid in strict accordance with 52% of line haul determined using the EBLD (Ex. B, Green Affidavit, ¶¶ 25-28).

11. Because of the application of the EBLD, Mervyn was paid more on some shipments for services that he would not have been paid but for the application of the EBLD. On the Vitacca and Blankenship shipments, for example, he was paid over $2,600 more than he would have been paid if EBLD was not applied (Ex. C, Johnson Affidavit, ¶¶ 21-24).

12. Contrary to the allegations in ¶ 36 of the Complaint (Exhibit A), not only was Mervyn was never required to purchase packaging materials from Defendants, but in the circumstances alleged, such materials were provided to Mervyn for free. If Mervyn had chosen not to use the free materials, and instead to acquire them from a source of his choosing, Newesco would have given him a credit for the cost of those materials used on the shipment. (Ex. B, Green Affidavit, ¶¶ 15-16).

13. Except for clerical errors, Mervyn was paid 100% of the fuel surcharge paid by the customer for each of his shipments. (Ex. B, Green Affidavit, ¶ 17).

14. At no time was Mervyn charged back for expenses in an amount greater than that incurred by Newesco. The only such expense asserted by Mervyn related to shuttle truck expense, but Newesco never marked up that expense. Defendants' conduct complied with Section 13(a) of the Lease, which provided that chargebacks would be "the actual, documented cost *to Agent*, without markup . . ." (emphasis added). It was also consistent with Section 3 of the Lease, which provides that Mervyn is responsible for all administrative charges charged by Atlas to Newesco with respect to Mervyn. Shuttle trucks are obtained by Atlas for Mervyn only at his request. (Exhibit A; Ex. B, Green Affidavit, ¶¶ 18-21).

15. Mervyn was never required to purchase insurance from Defendants. Most owner-operators chose to acquire insurance through a program established by Newesco because it was much less expensive than the cost of insurance available in the marketplace. (Exhibit A; Ex. B, Green Affidavit, ¶ 22; Ex. F, Charles Schaper affidavit).

16. On military shipments, the military contracts with a carrier that is qualified under the military Surface Distribution and Distribution Command ("SDDC") program for household goods shipments called DP3 (a "Military Carrier"). There are hundreds of such Military

Carriers. These Military Carriers s are required to be qualified under DP3 and to perform certain services, including but not limited to obtaining surveys, preparing paperwork, customer service, overseeing shipments, claims responsibility, and invoicing the government. For such services, the industry standard is that the Military Carrier receives a discount equal to 25% of the total amount billed to the Military Carrier in regard to such shipments. Included in the services is the choice of which Department of Transportation authorized carrier(s) will actually haul the shipment (the "Hauling Carrier"). When Atlas is the Hauling Carrier, Atlas' customer is the Military Carrier, not the military. (Ex. F, Robert Ewing Affidavit; Ex. C, Johnson Affidavit, ¶ 25).

17. Atlas Van Lines, Inc. is a wholly owned subsidiary of Atlas World Group, Inc. John Westerberg, CEO of Newesco, is one of 49 stockholders of Atlas World Group, Inc., owns less than four percent of the outstanding stock of Atlas World Group, Inc., and is one of 21 members of the Board of Directors of Atlas World Group, Inc. John Westerberg is not a member of the Board of Directors of Atlas Van Lines, Inc. Neither John Westerberg nor Newesco have any ownership interest in Atlas Van Lines, Inc., nor do either have a controlling interest in Atlas World Group, Inc. (Ex. G., Stacie Banks Affidavit).

18. For all 33 of Mervyn's shipments while he was under contract with Newesco, the carrier was Atlas Van Lines, Inc. In none of those shipments did Newesco act as the carrier; rather, Newesco acted solely as Atlas' agent for each of those shipments. (Ex. B, Green Affidavit, ¶ 29).

Dated: June 4, 2013                    Respectfully submitted,

                                                   NEWESCO, INC. and ATLAS VAN LINES, INC., Defendants

                                                   By:  s/David H. Levitt
                                                          David H. Levitt

David H. Levitt
Steven M. Puiszis
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000

## CERTIFICATE OF SERVICE

I hereby certify that, on June 4, 2013, I electronically filed the above and foregoing **DEFENDANTS' LOCAL RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** through the Court's ECM/CF system which will cause electronic notification of this filing and copies of all documents referenced herein to be sent to all counsel of record.

s/ David H. Levitt
One of Defendants' Attorneys
