UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS MERVYN, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 6594 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| NELSON WESTERBERG, INC., NEWESCO, INC., | ) | |
| NELSON WESTERBERG INTERNATIONAL, and | ) | |
| ATLAS VAN LINES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Thomas Mervyn, an independent truck driver, brought this putative class action against

Nelson Westerberg, Inc., Nelson Westerberg International, and Newesco, Inc. (collectively,

"Newesco"), and Atlas Van Lines, Inc., alleging that they violated the federal Truth-in-Leasing

regulations implementing the Motor Carrier Act of 1980, Pub. L. No. 96–296, 94 Stat. 793

(codified as amended in scattered sections of 49 U.S.C.), and unjustly enriched themselves in

violation of state law, by underpaying their drivers. Doc. 1. Mervyn has moved to certify a class

of drivers to pursue the Truth-in-Leasing claims, Doc. 324, and Defendants have moved for

summary judgment against Mervyn on those claims, Doc. 362. The summary judgment motion

is granted, and the class certification motion is denied without prejudice.

**Background**

The following facts are set forth as favorably to Mervyn as the record and Local Rule

56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment,

the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo

Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

Mervyn is what is known in the trucking industry as an "owner-operator," which means that he owns a truck and hires out the truck together with his driving services. Doc. 397 at ¶ 6. Atlas and Newesco are trucking companies; Atlas is a "carrier" and Newesco is its "agent." *Id.* at ¶¶ 1-4. Generally, when a customer (called a "shipper") hires a carrier to move its things from one place to another, the carrier passes on portions of the job to an agent or agents, and the "hauling agent" contracts out the driving portion of the job (known as "line haul") to an owner-operator. *Id.* at ¶¶ 7-8. Atlas occasionally worked under yet another firm on shipments for the military; in those cases, the Department of Defense would pay the other firm for the shipment, *that* firm would hire Atlas, Atlas would hire Newesco, and Newesco would hire an owner-operator to haul the goods. *Id.* at ¶¶ 62-66. The parties disagree about what to call the relationship between Atlas and the other firm—Defendants call it a "subcontract" while Mervyn calls it an "interchange agreement"—but they agree on the broad description of the arrangement. *Id.* at ¶¶ 62-63.

Federal law regulates the relationships between carriers, agents, and owner-operators. The Federal Motor Carrier Safety Administration's Truth-in-Leasing regulations, 49 C.F.R. § 376.11 *et seq.*, govern the content of contracts between carriers (or their agents) and owner-operators; for instance, the contracts must be in writing, § 376.11(a), must clearly state that the carrier is obligated to maintain certain insurance coverage, § 376.12(j)(1), and must clearly identify the circumstances in which the carrier or agent may charge the owner-operator for expenses (known as "charge backs"), § 376.12(h). As this court held in denying Defendants' earlier summary judgment motion, § 376.12 additionally requires carriers and their agents to "adhere[] to and perform[]" all required provisions of their leases with owner-operators. 76 F. Supp. 3d 715, 717 (N.D. Ill. 2014).

Mervyn performed several jobs for Newesco (and, through Newesco, for Atlas) between February and December of 2010.  Doc. 397 at ¶ 6.  A single lease governed their relationship. *Id*. at ¶ 28.  The parties dispute how best to interpret several of the lease's provisions, but only two are pertinent here.  The first, in Schedule B, states that Mervyn would receive "52% of line haul revenue for transportation earned less any pick-up or set-off charges incurred against these line haul revenues."  Doc. 368-2 at 15.  The second, in Sections 11(e) and (f), states:

> (e) At the time of each payment to Contractor, Agent shall provide a copy of a document in the form and using the designation established by Agent, representing an accounting of the financial accounts and transactions between Agent and Contractor.
>
> (f) Financial entries made by Agent on payment documents shall be conclusively presumed correct and final if not disputed by Contractor within 180 days after distribution.  On the date 180 days after distribution, such documents shall constitute the primary business record between Agent and the Contractor with respect to financial transactions existing between the parties as reflected on the statements, and additional underlying documentation, in support of the documents, shall not be required as a matter of proof before any administrative or judicial tribunal.

*Id*. at 9-10.  The lease does not define the term "payment documents."  However, after each shipment, Mervyn received documents, called "settlement sheets," purporting to show what he was paid.  Doc. 397 at ¶¶ 52-54.  Mervyn also received a "monthly debit report" describing expenses and charge backs that he incurred during the previous month, and after the lease ended, he received "Financial Result Reports" describing allocations of payments between Atlas and its agents on shipments that he hauled.  *Id*. at ¶ 59; Doc. 418 at ¶ 28.

Mervyn emailed Newesco and Atlas about his pay several times during their relationship. In March 2010, Mervyn emailed Atlas about an upcoming shipment; the email read, "What the thinking on the packing?  50%90%  Why?"  Doc. 418 at ¶ 39; Doc. 413-3 at 2.  He emailed Atlas again in May 2010 about a military shipment he had hauled earlier that month, stating: "I'm looking at the gbl and the rate is more than 155%?  Any reason why.  Which one is right?

Thanks." Doc. 418 at ¶ 40; Doc. 413-4 at 2. He wrote back in June 2010 about the same

military shipment as well as another one: "Hey how do I go about getting the final rated bills for

shipper Thompson and Turner. I still can't see how a 27K pack job only pays 3K I just like to

see where it's all going. I'm thinking it should be around 6 or 7. ?" Doc. 418 at ¶ 41; Doc. 413-

5 at 2.

> Also in June 2010, Mervyn emailed Newesco about his pay for an upcoming job:

> > I'm packing 24K today but I do need to talk about the way they pay. This just
> > isn't the way I can operate my truck and my house. I have asked several times
> > what the shipment pays and always get the same answer, I don't know.
> > Without a figure on how much a job pays I'm not going to be able to put it on
> > my truck. I was hopping I didn't have to do this here but it's clear now that I
> > do. I love to work but it has to be enough to make my bills and enough to
> > make it worth staying away from my wife and kids. I do hope we can work
> > this out.

Doc. 418 at ¶ 42 (misspelling in the original); Doc. 413-6 at 2. And on January 31, 2011—soon

after he had hauled his last load for Newesco—Mervyn wrote a final email to Atlas:

> > David you must have misunderstood. I want the actual bill that are sent to the
> > DOD. I want to see what the [line haul] that was billed was on each
> > shippment, I want to see what the fuel surcharge was on each job. I want to
> > see what was taken out of each shippment starting withe the first company all
> > the way to the DOD this includes what for example what American moving or
> > Charter has taken before I get paid. The fuel surcharge should be mine from
> > start to finish regardless where the job started and my contract says that I get
> > paid on [line haul] it doesn't say after Charter or American which we both
> > know is Westerberg takes another peice before I get paid , I don't see anywher
> > in the contract that says I pay Westerberg more than one time for each
> > shippment. You might be making more money but your ethics are as low as
> > they go . Please revise your paperwork ad get me the paperwork I'm asking
> > for. Thank you and while your at it please send the 1000$ debit you told Bob
> > Akers to take from my paycheck with nothing to back up the reason for the
> > debit. You can send that in a separate check from the return of my escrow
> > which I hope you don't play games with.

Doc. 418 at ¶ 43 (misspellings in the original); Doc. 413-7 at 2.

> As the last email suggests, Mervyn's relationship with Defendants ended on a sour note.

Mervyn filed this suit in September 2011 against Newesco, Atlas, and three of the companies'

officers, Doc. 1, although Mervyn voluntarily dismissed the officers months later, Doc. 32. Mervyn alleges that Defendants violated the lease (and therefore the Truth-in-Leasing regulations) in nine ways: (1) by reducing his pay to account for discounts to customers, using what is known as the "effective bottom line discount," or "EBLD," accounting method; (2) by using Atlas's revenue, rather than the revenue of the company that hired Atlas, as the benchmark for calculating his line haul pay for military shipments; (3) by failing to pay him "100% of the Fuel Surcharge," as the lease required; (4) by assessing an undisclosed $45 "audit fee"; (5) by assessing an undisclosed 10 percent "Newesco deduction" to his packing and unpacking compensation; (6) by assessing an undisclosed fee whenever he used a shuttle truck (a smaller truck that allows a trucker to ferry goods to a confined space that he could not reach using his own, larger truck); (7) by assessing an undisclosed "survey fee"; (8) by charging him more for insurance than they paid the insurer in premiums; and (9) by removing $1,000 from his escrow account for damage to a customer's goods.  Doc. 396 at 10.

Defendants moved for summary judgment earlier in the case, Doc. 135, the court granted Mervyn's request for additional discovery under Rule 56(d), Doc. 156, and Defendants then supplemented and renewed their summary judgment motion, Doc. 168.  The court denied the motion.  76 F. Supp. 3d 715 (N.D. Ill. 2014).  In so doing, the court addressed certain issues— whether § 376.12 governs only the content of the parties' lease or whether it also requires compliance therewith, and whether the unjust enrichment claim could proceed given the existence of a written agreement—on the merits.  *Id*. at 716-19.  With respect to whether Defendants actually breached the lease, the court denied summary judgment on the ground that Defendants had violated Local Rule 56.1 by filing briefs that cited directly to the record

materials attached to the parties' Local Rule 56.1 statements and responses rather than to the statements and responses themselves. *Id*. at 719-21.

Defendants moved for the court to reconsider its ruling on the question whether they breached the lease, Doc. 277, arguing that Local Rule 56.1 allows summary judgment briefs to cite directly to record materials. The court denied the motion, but allowed Defendants to file a new, compliant summary judgment motion limited to the question whether they breached their lease with Mervyn. 2015 WL 6792104 (N.D. Ill. Oct. 30, 2015). They filed a new summary judgment motion in December 2015. Doc. 362.

Meanwhile, in July 2015, Mervyn moved to certify a class of owner-operators. Doc. 324. Although Mervyn's state law unjust enrichment claim survived Defendants' first summary judgment motion, he seeks class certification only with respect to the federal Truth-in-Leasing claims. Doc. 325 at 6 ("This case involves a scheme by Defendants … to skim and reclassify revenue from shipments hauled by Plaintiff and similarly-situated owner-operator truck drivers in violation of the federal truth-in-leasing regulations …."); *ibid*. ("This skim and reclassify scheme violates the Truth-in-Leasing Regulations because it is not spelled out in the contracts with Defendants and is contrary to the payment provisions of those contracts."); *id*. at 7-8 (discussing the Truth-in-Leasing regulations at length); *ibid*. ("Plaintiff's claims seek recovery for Defendants' reductions to owner-operator compensation in violation of the Truth-in-Leasing Regulations."); *id*. at 8 ("This Court should follow the lead of numerous other federal courts that have granted class certification in similar Truth-in-Leasing Regulation cases."); *id*. at 9 ("[T]his case presents a model of commonality and typicality as required by Rule 23. The claims of each class member arise from the application of *a single regulatory regime—the Truth-in-Leasing Regulations* ….") (emphasis added).

**Discussion**

Defendants argue that they are entitled to summary judgment on Mervyn's federal claims because he failed to contest the accuracy of any payment documents within the 180-day period prescribed by Section 11(f) of the lease and therefore that their payments to Mervyn must be presumed to comply with the lease. Doc. 363 at 36-40. Again, Sections 11(e) and (f) read as follows:

> (e) At the time of each payment to [Mervyn], [Newesco] shall provide a copy of a document in the form and using the designation established by [Newesco], representing an accounting of the financial accounts and transactions between [Newesco] and [Mervyn].
>
> (f) Financial entries made by [Newesco] on payment documents shall be conclusively presumed correct and final if not disputed by [Mervyn] within 180 days after distribution. On the date 180 days after distribution, such documents shall constitute the primary business record between [Newesco] and [Mervyn] with respect to financial transactions existing between the parties as reflected on the statements, and additional underlying documentation, in support of the documents, shall not be required as a matter of proof before any administrative or judicial tribunal.

Doc. 368-2 at 9-10.

Mervyn argues that Defendants have misread Section 11(f). According to him, the provision "simply allows Defendants to destroy certain underlying documents that are not necessary to the future dispute," while "expressly and explicitly contemplat[ing] the use of other documents—'payment documents'—in future litigation." Doc. 396 at 21. But that is far from all that Section 11(f) does; it states not only that Newesco may use "[f]inancial entries … on payment documents" in future litigation, but also that those entries "shall be conclusively presumed correct and final." Doc. 368-2 at 10. That language plainly means that if Mervyn fails to contest the accuracy of his payment documents—including what he was owed under the lease and the basis for calculating those amounts—within 180 days of receiving them, then he cannot later argue that the payment documents incorrectly set forth what he was owed for those

shipments. *See Bays Exploration, Inc. v. PenSa, Inc.*, 2012 WL 4128120, at *14 (W.D. Okla. Sept. 18, 2012) (holding that the results of an audit conclusively established the amount that one party owed under an agreement, where the agreement included a provision stating that "all bills and statements rendered … during any calendar year shall conclusively be presumed to be true and correct after twenty-four … months following the end of such calendar year, unless within [that period] a Non-Operator takes written exception thereto …"); *CabelTel Int'l Corp. v. Chesapeake Exploration, LLC*, 2012 WL 2849289, at *5 (Tex. App. July 12, 2012) (holding that billing statements correctly described the amount that one party owed under an agreement with the same provision); *Grynberg v. Dome Petrol. Corp.*, 599 N.W.2d 261, 266-67 (N.D. 1999) (holding, in a suit over a contract containing the same clause, that because it was "undisputed [that the plaintiff] did not make a written exception to [the defendant's] costs within that time," the defendant's "expenditures … were conclusively presumed true and correct" for the purposes of the suit).

To support his contrary reading of Section 11(f), Mervyn cites *Lippo v. Mobile Oil Corp.*, 776 F.2d 706 (7th Cir. 1985), which holds that "if there are two possible constructions, only one of which will work a forfeiture, the construction may be adopted that will avoid the forfeiture and preserve the rights of the parties." *Id*. at 715. But *Lippo* does not help him. First, as just explained, Mervyn's proposed reading ignores the words, "shall be conclusively presumed correct and final," and thus is not a "possible construction" of Section 11(f). *See Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (holding that an interpretation of a contractual provision was unreasonable given that it would have made other provisions superfluous); *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 630 (7th Cir. 1993) (same). And second, Section 11(f) does not "work a forfeiture." It does not prohibit Mervyn from suing Newesco unless he complains about his payment documents within 180 days; rather, it merely establishes the accuracy of the payment calculations in

those documents.  For instance, even if Mervyn did not dispute the payment documents, he could sue Defendants for failing to pay him what the documents showed that he should have been paid.

Mervyn also points out that Section 11(f) does not define "payment document."  Doc. 396 at 21.  That is correct, but at the same time Mervyn agrees that the settlement sheets that he received after each shipment qualify as payment documents.  *Ibid*.  Under Section 11(f), then, the "financial entries" on the settlement sheets are "conclusively presumed correct and final."  It does not matter whether entries on other documents, such as the Financial Result Reports that Defendants provided Mervyn after the lease was terminated in January 2011, *also* are conclusively presumed correct and final, particularly given that Mervyn never contends that those other documents contradict the settlement sheets.

So, unless Mervyn "disputed" financial entries on any of his settlement sheets within 180 days of receiving them, those entries must be presumed correct and Defendants are entitled to summary judgment, for he has not alleged that he was not paid the amounts shown on the settlement sheets.  Mervyn contends that he *did* dispute several payments, and in support he cites the five emails, set forth in the Background section, that he sent between March 2010 and January 2011.

 The first email, sent March 29, 2010, stated simply, "What the thinking on the packing? 50%90%  Why?"  Doc. 413-3 at 2.  The subject line read, "HN719200 Alonzo," and Mervyn admits that the email concerned "the Alonzo shipment hauled in April 2010."  *Ibid*.; Doc. 418 at ¶ 39.  The email does not qualify as Mervyn "disputing" financial entries on payment documents. As an initial matter, the email was phrased as a question rather than a statement; Mervyn said, "Why are you paying me X?", not, "You should be paying me Y."  And even if a question could in theory dispute a payment document entry, Mervyn sent the email *before* he performed the job that the email discussed.  Section 11(e) says that payment documents are provided "[a]t the time of each payment to [Mervyn]"; that necessarily means that Mervyn's pre-performance email

could not possibly have disputed the accuracy of financial entries on payment documents that Mervyn had not yet received.  Doc. 368-2 at 9.

The second email, sent May 6, 2010, had a subject line reading "HN832130 Thompson (CO to CA)", and its body read, "Terresa I'm looking at the gbl and the rate is more than 155%? Any reason why.  Which one is right?  Thanks."  Doc. 413-4 at 2.  This email at least dealt with a shipment that had already occurred.  Still, a reasonable factfinder could not conclude that the email disputed any financial entry on any payment document.  Mervyn framed the second email, like the first, as a request for an explanation rather than as an assertion of a mistake.  Beyond that, the email is incomprehensible.  What does "gbl" mean?  (From the context of this litigation, perhaps it means something like "gross bottom line," but what does *that* mean?)  And what document is Mervyn addressing?  Presumably, it is a document related to the Thompson shipment, but which one?  And what does Mervyn mean by "the rate"?  He asks, "Which one is right?", which implies that there are two different figures, and one can infer from context that one of those figures is either the "gbl" or the "rate," but what is the other figure?

Theresa Banta, an Atlas employee, responded to the email—"You get paid off 155%.  Its [sic] a more accurate number of what you will be paid after everyone gets their piece of the pie…"—but that does not illuminate things.  *Ibid.* (ellipses in original).  155 percent of what?  Nothing in the record, including Mervyn's brief opposing summary judgment, Local Rule 56.1(b)(3)(B) response, or Local Rule 56.1(b)(3)(C) statement, answers any of the above-stated questions.  A non-movant cannot evade summary judgment by placing opaque documents into the record and leaving the court to tease out their significance.  *See Jackson v. Ivens*, 565 F. App'x 115, 119 (3d Cir. 2014) (holding, where the plaintiff moved the district court to reconsider its grant of summary judgment against him on the ground that the court had not considered an

electrocardiogram ("ECG"), that reconsideration would have been inappropriate because the plaintiff "[did] not explain the meaning or significance of this ECG result or how it supports a determination" that he was entitled to relief); *Caddy v. J.P. Morgan Chase Bank*, 237 F. App'x 343, 348 n.5 (10th Cir. 2007) (holding that a "documentary stamp" was not enough to put a fact in dispute where the non-movant "fail[ed] to explain the claimed significance of the stamp"); *Allen v. Chi. Transit Auth.*, 2000 WL 1139898, at *9 (N.D. Ill. Aug. 10, 2000) (granting summary judgment on the ground that, because the non-movant did not "place [a document's] data in context or explain the significance of other data in [the document]," the document "simply [did] not support a reasonable inference" that the plaintiff was entitled to recover). The second email therefore does not raise a genuine issue as to whether Mervyn disputed any entry on any payment documents.

In the third email, dated June 2, 2010, Mervyn wrote to Atlas: "Hey how do I go about getting the final rated bills for shipper Thompson and Turner. I still can't see how a 27k pack job only pays 3k I just like to see where it's all going. I'm thinking it should be around 6 or 7. ?" Doc. 413-5 at 2. Again, it is clear that Mervyn was simply requesting information; he wanted to know how to get "the final rated bills" for two customers. It is likely that the *reason* Mervyn requested the information was that he was suspicious he was being underpaid. But he phrased his email as a request for verification rather than as an accusation: he "just want[ed] to see where [the money]'s all going." *Ibid*. There is no indication in the record that Mervyn ever followed up by actually telling Atlas or Newesco, "You paid me less for packing than you should have." Additionally, the email does not pertain to any claim in this suit. One of Mervyn's claims in this suit alleges that Defendants breached the lease by illegally deducting 10 percent from his packing compensation, Doc. 396 at 17, but the email addresses a much larger (by an order of

magnitude) discrepancy in packing compensation—$3,000 versus $6,000 or $7,000—and so does not implicate that claim.

The fourth email, sent June 29, 2010, reads:

> I'm packing 24K today but I do need to talk about the way they pay.  This just isn't the way I can operate my truck and my house.  I have asked several times what the shippment pays and always get the same answer, I don't know.  Without a figure on how much a job pays I'm not going to be able to put it on my truck.  I was hopping I didn't have to do this here but it's clear now that I do.  I love to work but it has to be enough to make my bills and enough to make it worth staying away from my wife and kids.  I do hope we can work this out.

Doc. 413-6 at 2 (misspellings in the original).  Like the first email, this email addressed a job that Mervyn had not yet performed, and thus it cannot possibly dispute a payment document that he had not yet received.  A reasonable factfinder could conclude only that Mervyn was attempting to renegotiate the terms of his lease for future payments rather than contesting whether the amounts that he had already been paid complied with his lease.

In the fifth email, sent on January 31, 2011, Mervyn arguably did dispute financial entries on payment documents:

> David you must have misunderstood.  I want the actual bill that are sent to the DOD.  I want to see what the [line haul] that was billed was on each shippment, I want to see what the fuel surcharge was on each job.  I want to see what was taken out of each shippment starting with the first company all the way to the DOD this includes what for example what American moving or Charter has taken before I get paid.  The fuel surcharge should be mine from start to finish regardless where the job started and my contract says that I get paid on [line haul] it doesn't say after Charter or American which we both know is Westerberg takes another peice before I get paid, I don't see anywher in the contract that says I pay Westerberg more than one time for each shippment.  You might be making more money but your ethics are as low as they go .  Please revise your paperwork ad get me the paperwork I'm asking for.  Thank you and while your at it please send the 1000$ debit you told Bob Akers to take from my paycheck with nothing to back up the reason for the debit.  You can send that in a separate check from the return of my escrow which I hope you don't play games with.

Doc. 413-7 at 2 (misspellings in the original).  The basic form of a dispute is there.  Mervyn is upset that, for military shipments, his line haul pay was calculated based on Atlas's revenue rather than on the revenue of Charter Properties, Inc., the military contractor that hired Atlas, Doc. 397 at ¶ 62, and he asserts that the practice violated the lease ("the contract says that I get paid on [line haul] it doesn't say after Charter … takes another p[ie]ce ….").  So, insofar as Mervyn received payment documents on military shipments in the 180-day window ending on January 31, 2011, a reasonable factfinder could conclude that those payment documents are *not* presumed correct and final under Section 11(f).

Mervyn therefore disputed only one of his present claims with Defendants within 180 days of receiving the relevant payment documents: that his line haul pay on military shipments should have been based on the amount that the military paid Charter, rather than on the amount that Charter paid Atlas.  Mervyn argues that his other claims nevertheless survive because Defendants withheld facts that would have allowed him to timely complain about his compensation and therefore are equitably estopped from using Section 11(f) as a defense to his suit.  Doc. 396 at 25-27.  Mervyn takes no position on whether the court should look to federal law or Texas law (which governs interpretation of the lease, *see* 76 F. Supp. 3d at 721) when analyzing his equitable estoppel argument, but the two track each other closely.  Equitable estoppel excuses a party from complying with a deadline when his adversary has "taken steps" to prevent him from complying.  *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000).  The party asserting equitable estoppel must show: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment."  *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002) (federal law); *see also Oliver v. Frank*, 222 F. App'x 517, 519 (7th Cir. 2007) (federal law); *LaBonte*, 233 F.3d at 1053 (federal law); *Advent*

*Trust Co. v. Hyder*, 12 S.W.3d 534, 541 (Tex. App. 1999) (Texas law) ("The elements of equitable estoppel are: 1) a false representation or concealment of material facts; 2) made with knowledge, actual or constructive, of those facts; 3) with the intention that it should be acted on; 4) to a party without knowledge or means of obtaining knowledge of the facts; 5) who detrimentally relies on the representations. A party asserting any form of equitable estoppel must have reasonably relied on the defendant's misrepresentations or concealment.") (citation omitted).

Mervyn's problem is that he never asserts that he relied, reasonably or otherwise, on Defendants' failure to provide him with more detailed or more accurate information about his compensation. He lists several pieces of information that Defendants failed to provide him—the settlement sheets referred to the "survey fee deduction" as an "OA deduction," "could have (but intentionally did not) easily identify … that [Mervyn's] percentage based linehaul compensation was based upon an adjusted revenue figure," did not specify that his packing pay was reduced by a "10% non-Carrier discount," and so on. Doc. 396 at 25-26; Doc. 397 at ¶¶ 27-38. His Local Rule 56.1(b)(3)(C) statement also asserts that his "course of conduct [was] *consistent with* that of an owner-operator who—based on unclear documentation, no explanation, and assurances that he was being paid correctly—was nonetheless not able to specifically identify the reductions now uncovered …." Doc. 418 at ¶ 27 (emphasis added). But Mervyn's brief, Local Rule 56.1(b)(3)(B) response, and Local Rule 56.1(b)(3)(C) statement never state that he *actually did not know* the specific information that he faults Defendants for withholding. Docs. 396-97. And if Mervyn actually knew that information, then he could not have acted in reliance on Defendants' failure to more clearly communicate that information to him—and indeed, he never even argues that he did rely on the obfuscation. So, because Mervyn would bear the burden of

proving equitable estoppel at trial, *see Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992) (federal law); *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968) (Texas law), and because he has not adduced sufficient evidence to allow a reasonable factfinder to conclude that he actually did not know the specific information that he faults Defendants for withholding or that he reasonably relied on the supposed lack of information, equitable estoppel does not protect him from summary judgment. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

Mervyn also argues that Defendants' failure to share certain information with him equitably *tolled* the application of Section 11(f). Doc. 396 at 27-30. Equitable tolling is the principle that a limitations period or other deadline is tolled during a period in which, although a party was "pursuing his rights diligently, … some extraordinary circumstance stood in [the] way" of his acting on time. *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see also Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994) ("Equitable tolling is appropriate when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim."); *Bilinsco Inc. v. Harris Cnty. Appraisal Dist.*, 321 S.W.3d 648, 654 (Tex. App. 2010) ("Equitable tolling applies where a claimant actively pursued his judicial remedies but filed a defective pleading during the statutory period, or where a complainant was induced or tricked by his adversary's misconduct into allowing filing deadlines to pass.") (internal quotation marks omitted). Mervyn contends that, because he lacked access to the information that Defendants were withholding, he was prevented from complaining about his pay within Section 11(f)'s 180-day window. Doc. 396 at 27-30. But that argument fails for the same reason that the equitable estoppel argument fails. Mervyn's briefs, Local Rule 56.1(b)(3)(B) response, and Local Rule 56.1(b)(3)(C) statement never assert that he was unaware of the facts that supposedly

trigger equitable tolling, and if he was aware of those facts, then Defendants' decision to conceal them could not have prevented him from lodging a dispute. Nor does Mervyn assert that he actually relied on Defendants' supposed obfuscation. In fact, at least under federal law, equitable tolling is inappropriate as long as he was aware of even the *possibility* that he had a valid grievance. *Cf. Chakonas*, 42 F.3d at 1136 ("A plaintiff who is aware of his injury is not allowed to wait [to sue] until the time that he becomes aware of its unlawful nature."); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) ("If a plaintiff were entitled to have all the time he needed to be *certain* his rights had been violated, the statute of limitations would never run—for even after judgment, there is no certainty.").

Mervyn also argues that Section 11(f) does not apply to suits to enforce regulatory requirements like those imposed by the Truth-in-Leasing regulations. Doc. 396 at 22. In support, he points to Section 22 of the lease, which provides that the lease "shall be subject to all Federal and state statutes, and the rules and regulations of the DOT. In the event of any conflict, this agreement shall be modified to meet such requirements." Doc. 368-2 at 13. Actions under the regulations are subject to a four-year statute of limitations, Mervyn argues, so they conflict with Section 11(f). But Section 11(f) does not purport to modify any statute of limitations for bringing suit. It provides only that unchallenged payment documents conclusively establish the amount that Mervyn is owed; it does not prohibit Mervyn from bringing suit at any point within the statutory limitations period for Defendants' failure to pay him that amount.

Lastly, Mervyn argues that because the lease was an agreement between him and *Newesco*, Section 11(f) does not govern his claims against *Atlas*. But that argument ignores that Atlas's liability depends upon Newesco's. The Truth-in-Leasing regulations require carriers such as Atlas to "ensure that … owners receive[] all the rights and benefits due an owner under

the leasing regulations." 49 C.F.R. § 376.12(m). Section 11(f) establishes that Mervyn *did* receive all the rights and benefits he was due, at least with respect to Mervyn's non-military claims. Those claims therefore cannot succeed against Atlas any more than they can succeed against Newesco.

Accordingly, Section 11(f) entitles Defendants to summary judgment on every Truth-in-Leasing claim except for the one alleging that Defendants underpaid Mervyn on military shipments. As noted, that claim alleges that Defendants breached the lease by calculating Mervyn's pay for military shipments as a percentage of Atlas's revenues rather than the revenues of Charter, the firm that hired Atlas. Doc. 396 at 16.

Defendants argue that summary judgment on that claim is appropriate because they paid Mervyn *more* than they owed him on military shipments: The lease specified that Mervyn would be paid 52 percent of Atlas's line haul revenue, but Defendants paid Mervyn 71 percent of Atlas's line haul revenue on several military shipments; so, Defendants insist, Mervyn was not harmed. Doc. 363 at 18. That argument fails. Mervyn's claim is that he was owed 52 percent of Charter's line haul revenue, which is not necessarily less than 71 percent of Atlas's; for instance, if Mervyn was "overpaid" on a shipment for which Charter received $10,000 in line haul revenue and Atlas received $7,000, then Mervyn would have been paid $4,970 (71 percent of $7,000), even though by his calculations he should have been paid $5,200 (52 percent of $10,000).

Even so, there is no genuine dispute about the lease's meaning. Under Texas law, if a written contract is unambiguous, then a court must "seek to enforce the intention of the parties as it is expressed in the [agreement]." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005); *see also In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005) ("[W]hen parties enter into an agreement based on a writing that is not ambiguous, the court will give effect to the parties' intention as expressed in the writing."). "That the parties disagree about a contract's meaning does not render it

ambiguous." *In re Sterling Chems., Inc.*, 261 S.W.3d 805, 808 (Tex. App. 2008). In determining whether a proposed interpretation is reasonable, a court may consider "[e]vidence of surrounding circumstances" as well as the text of the agreement itself. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981).

The relevant compensation provisions are contained in Schedule B:

### Payments to Contractor

\*\*\*

### Line Haul Service

52% of line haul revenue for transportation earned less any pick-up or set-off charges incurred against these line haul revenues.

Doc. 368-2 at 15. Mervyn submits that this provision entitled him to 52 percent of Charter's line haul revenue rather than 52 percent of Atlas's line haul revenue whenever Charter was the primary contractor. His argument on that point is vanishingly thin: "[O]n military moves involving single factor pricing … Defendants calculated Plaintiff's linehaul compensation only on the revenue received by them, as opposed to the total revenue received on the shipment, which was much higher. By adjusting revenue in this way, Defendants paid Plaintiff less. But, again, unlike other percentage-based components of his compensation, the Lease does not restrict his percentage-based linehaul compensation to some limited portion of total revenue." Doc. 396 at 16. This utterly perfunctory and unsupported presentation results in a forfeiture of the point. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general

argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks omitted).

Even absent the forfeiture, Mervyn's proposed interpretation still fails. The lease does not define the term "revenue" in Schedule B, but it is clear from context that the term refers to Atlas's revenue, not Charter's. *See Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (in interpreting a contract, courts must "consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless."); *Ramsay v. Tex. Trading Co.*, 254 S.W.3d 620, 631 (Tex. App. 2008) ("Although we agree that the word 'may' makes interpretation of this clause challenging, we find from the context that the parties intended to make the forum mandatory once ADM made its choice."); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995) (under the federal common law of contract interpretation, a collective bargaining agreement "should be read as a whole so that all parts will be given effect."). For instance, the lease defines "Carrier" to mean Atlas, Doc. 368-2 at 2, and a different part of Schedule B says that Mervyn is entitled to "90% of revenue earned from applicable packing container and/or packing labor, less Carrier deductions," *id.* at 15. That language makes sense only if "revenue" refers to Atlas's revenue; like the IRS, Mervyn is entitled to a percentage of what Atlas takes in after accounting for certain deductions. But it would make very little if any sense if "revenue" referred to Charter's revenue on military shipments; after all, how could Atlas make a deduction from revenue belonging to Charter? The fact that "revenue" refers to Atlas's revenue in that part of Schedule B means that it likewise refers to Atlas's revenue in the phrase "52% of line haul revenue for transportation earned less any pick-up or set-off charges incurred against these line haul revenues." *See RSUI*

*Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 126 (Tex. 2015) (describing a "natural presumption that [a] word … has the same meaning throughout" a document) (internal quotation marks omitted); *Chi. Area I.B. of T. Health and Welfare Trust Fund v. Thomas S. Zaccone Wholesale Produce, Inc.*, 874 F. Supp. 188, 191 (N.D. Ill. 1995) (explaining, in the context of interpreting a collective bargaining agreement, that "when the same word is used twice in close proximity, there exists a presumption that the word has the same meaning in both places") (citing *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993)).

More broadly, while Schedule B refers to Atlas and Newesco at various points—the EBLD is determined "under Carrier's rules" (Doc. 368-2 at 15); Mervyn receives a cut of "Agent's" (Newesco's) portion of the insurance surcharge "after Carrier deductions" (*ibid.*); Mervyn receives certain percentages of certain packing and unpacking revenue "less Carrier deductions" (*ibid.*); Mervyn can buy insurance coverage "through the Carrier upon request" (*id.* at 16)—it never refers to Charter or any other military contractor.  The lease thus creates a closed loop in which the only relationships that affect Mervyn's pay are those between Mervyn, Atlas, and Newesco.

To summarize, Mervyn alleges that Atlas and Newesco violated the lease in nine ways. For eight of those nine claims, Mervyn has adduced no evidence that would allow a reasonable factfinder to conclude that he lodged a timely complaint under Section 11(f) that would have allowed him to contest his pay later.  A reasonable factfinder could conclude that Mervyn did lodge a timely complaint for the ninth claim, the military shipments claim, but Mervyn forfeited that claim, and in any event it fails on its merits; for military shipments, Mervyn was owed 52 percent of Atlas's, not Charter's, line haul revenue.  Thus, summary judgment is appropriate for all of Mervyn's Truth-in-Leasing claims.

That leaves the class certification motion. Mervyn still has a state law unjust enrichment claim, but, as explained above, Mervyn has moved to certify a class only as to the federal Truth-in-Leasing claims. Neither of his class certification briefs even mentions the unjust enrichment claim, and his opening brief states that the proposed class meets Rule 23's commonality requirement because "[t]he claims of each class member arise from the application of a single regulatory regime—The Truth-in-Leasing Regulations …." Doc. 325 at 9. The court will not certify a class to pursue unjust enrichment claims when Mervyn has not asked it to do so.

As for the Truth-in-Leasing claims, the court understands that the preferred course is to first decide class certification and then resolve the merits. *See* Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time after a person sues … as a class representative, the court must determine by order whether to certify the action as a class action."); *Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013) ("The district judge dismissed the suit on the merits without, as we said, first considering whether to certify a class. Normally the issue of certification should be resolved first …."); *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) ("[I]t is preferable to review a motion for class certification first; a quick disposition on the merits is often not possible."); *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 475 (7th Cir. 1997) ("[I]t is the better policy for a district court to dispose of a motion for class certification promptly and *before* ruling on the merits of the case …."). But Mervyn does not even get out of the gate on eight of his nine federal claims because he did not comply with Section 11(f). That precludes him under Rule 23(a)(4) from being an adequate class representative for those eight claims. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) ("[The named plaintiffs'] claims are … significantly weaker than those of some (perhaps many) other class members; and … named plaintiffs who are subject to a defense that would not defeat unnamed class members are

not adequate class representatives."); *Swanson v. Lord & Taylor LLC*, 278 F.R.D. 36, 40 (D. Mass. 2011) ("Plaintiff, therefore, is not an adequate class representative because her failure to exhaust her administrative remedies subjects her to a unique defense that is inapplicable to claims held by other members of the putative class."); *Kingsbury v. U.S. Greenfiber, LLC*, 2009 WL 2997389, at *8 (C.D. Cal. Sept. 14, 2009) ("Plaintiff Segura has not pursued RORA's mandatory prelitigation requirements, and he is thus not an adequate class representative."); *Stubbs v. McDonald's Corp.*, 224 F.R.D. 668, 674 (D. Kan. 2004) ("Plaintiff … is not an adequate representative for the Title VII claims that he did not administratively exhaust.").

Mervyn might have been an adequate class representative for the military shipment claim, as he likely complied with Section 11(f) as to that claim. So, the court supposes that it might have certified a class limited to that claim, ordered that notice be given to the class, and only *then* reach the merits. But why compel the parties to spend the time, money, and effort necessary to engage in that process when, having the summary judgment briefs before it, the court already knows that the military shipment claim fails on the merits as a matter of law? That would have been wasteful, contrary to the Civil Rules' principal command that "[t]hey should be construed, administered, and employed by the court … to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Under the circumstances of this case, the court is justified in reaching the merits of the military shipment claim before addressing class certification. *See Thomas*, 706 F.3d at 849 ("So when as in this case the suit can quickly be shown to be groundless, it may make sense for the district court to skip certification and proceed directly to the merits."); *Chavez*, 251 F.3d at 630 ("If 'as soon as practicable' occurs after a case is already 'ripe for summary judgment' then it might be proper for a judge to consider a motion for summary judgment prior to considering a motion for class

certification.") (quoting *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995)). The same would hold for resolving the Section 11(f) issue for the other eight claims even if Mervyn were an adequate representative under Rule 23(a)(4) to pursue those claims.

The motion for class certification accordingly is denied. The denial is without prejudice to class counsel naming as a substitute proposed class representative an owner-operator who arguably complied with Section 11(f) as to the eight claims whose merits remain unresolved, as the Seventh Circuit has long and repeatedly held that if a named plaintiff falls short as a class representative, counsel should be allowed, if it can, to designate a new named plaintiff who better fits the bill. *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080-81 (7th Cir. 2013); *Randall*, 637 F.3d at 827; *Phillips v. Ford Motor Co.*, 435 F.3d 785, 786-87 (7th Cir. 2006); *Parks v. Pavkovic*, 753 F.2d 1397, 1404 (7th Cir. 1985). Class counsel has until April 28, 2016 to file an amended complaint with a new proposed class representative.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted, and Mervyn's federal claims under the Truth-in-Leasing regulations are dismissed with prejudice. Mervyn's class certification motion is denied without prejudice to class counsel naming a new proposed class representative by April 28, 2016. Defendants' motion to strike an expert report that Mervyn submitted to support his class certification motion, Doc. 349, is denied as moot and without prejudice to renewal if a new class representative moves for class certification and Mervyn again relies on the report. Mervyn's motion for leave to file a surreply in opposition to Defendants' motion to strike, Doc. 425, is denied as moot as well.

March 31, 2016

_____
United States District Judge